UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| ANDAO SILBAUGH<br><br>　　　　Plaintiff,<br><br>vs.<br><br>VIKING MAGAZINE SERVICES,<br><br>　　　　Defendant. | CASE NO. 1:11-CV-1299<br><br>JUDGE PATRICIA A. GAUGHAN<br><br>PLAINTIFF'S BRIEF IN SUPPORT OF HER MOTION FOR CLASS CERTIFICATION |

## I.     INTRODUCTION

Defendant Viking Magazine Services violated the Telephone Consumer Protection Act ("the TCPA") by sending text messages, via an automatic telephone dialing system, to thousands of consumers who did not provide a prior consent to receive them. Congress has structured the Act so each of the text messages is a violation of the TCPA. The text messages were all sent during a one-month period, by Viking's service provider, Xcel Direct. The messages advised the recipients to call Viking if they wanted a free gift card or to be entered in a sweepstakes. Over 1,000 consumers called the number provided in the text messages and were connected to Viking telemarketers, who attempted to sell them packages of magazine subscriptions. In view of the uniformity of Viking's conduct toward the putative class members, and the hundreds of violations of the TCPA committed by Viking, this matter is ideal for class certification.

## II.     FACTS

Viking is a telemarketing company that sells magazine subscriptions. Its modus operandi is to call consumers, tell them that they have won a prize (for example, a $500 shopping spree), use the lure of the "free" prize to obtain information about their income, and then attempt to sell them a package of magazine subscriptions. Moulder depo 59:9-62:6 (attached as Appendix 1);

1

P's Ex. 3 (Exhibit 3 contains numerous consumer comments referencing Viking's offer of a $500 shopping spree).[1] Mr. Moulder admitted that Viking does NOT give away $500 shopping sprees. Moulder depo 60:7-9.

Viking's sales practices have generated a large volume of complaints. See P's Exs. 3 and 5. As of October 2011, the Better Business Bureau had received 274 complaints during the previous 3 years regarding Viking. P's Ex. 4. Viking's refusal to address the underlying cause of the complaints compelled the Better Business Bureau to revoke Viking's accreditation in November 2010. Moulder depo 63:1-12.

As a telemarketer, Viking understands that the TCPA prohibits "any person within the United States" from making "any call (other than a call … made with the **prior express consent** of the called party) using any automatic telephone dialing system … to any telephone number assigned to a … cellular telephone service …." (Emphasis added.) 47 USCS § 227(b)(1)(A)(iii). In short, a business cannot use an automated system to call a cell phone, unless the owner of the phone has consented in advance to such a call. Up until 2010, to avoid violating the TCPA, Viking, which uses an ATDS to dial landlines, did not use an ATDS to call cell-phone numbers. Moulder depo 13:8-19. Instead, Viking has its telemarketers manually dial cell phone numbers. *Id.*

Viking acquires the cell phone numbers it calls by purchasing them from list brokers, who, in turn, have typically purchased the numbers from telephone service providers. Moulder depo 7:3-10:24. Viking cannot use an ATDS to call these cell phone numbers, because the consumers identified on these lists did not give their express consent to receive telemarketing

---

[1] Plaintiff's Exhibits 1 through 14 are attached to Moulder's deposition, while Exhibits 15 through 17 are attached to Monda's deposition.

calls from Viking. Moulder depo 42:2-12, 70:20-71:18 (Viking doesn't use automatic dialers to call cell phones because "[i]t's against the law"); 47 USCS § 227(b)(A)(iii).

In January or February 2011, Viking entered into an agreement with Xcel Direct to send Viking's text messages. Moulder depo 52:20-24; P's Ex. 1 and 13.

Prior to doing this, and despite being aware of the requirements of the TCPA for prior consent, Viking did not receive consents from any persons who would be robo-called on their cell phone. Moulder depo 96:16:20 ("Q. Do you know if they expressly permitted Viking Magazine Services and its agents to contact them? A. Don't know. Q. Did you ask for a copy of the consents? A. No.") Viking also did not receive anything in writing from Xcel Direct regarding such required consents. *Id.* at 96:3-20.

Between February 14, 2011 and March 11, 2011, Xcel Direct, whose principal place of business is a mailbox at a UPS Store,[2] sent thousands of Viking's text messages. Moulder depo 94:12-19; P's Ex. 14;. To answer the calls generated by the text messages, Viking set up a special call center staffed by its employees. Moulder depo 67:9-19 ("[w]e had like four people sitting over there taking phone calls"); Monda depo 36:16-20 ("[w]e had five or six agents") (attached as Appendix 2). Some of the called parties received the same message as the Plaintiff, which stated: "Guess what! You were qualified to receive $250 in free gift cards today ONLY! To find out more call 888-863-5570 now! TXT STOP TO STOP." Complaint, ¶ 14. Other called parties received the message stating that they could enter a $1 million sweepstakes. P's Ex. 16; Monda depo 38:8-21. Of the thousands of people who received these text messages,

---

[2] Xcel Direct's mailing address is 26895 Aliso Creek Road, #B524, Aliso Viejo, CA 92656. Defendant's initial disclosures (attached as Appendix 3); P's Ex. 13. This address is the address for a UPS Store. Appendix 4.

over 1,030 called Viking. Moulder depo 43:10-14; 95:6-14 (1,030 consumers contacted Viking after receiving a text message from Xcel Direct); P's Ex. 14.

The first common issue being determined through class certification is the 'defense' Viking is attempting—lack of knowledge that the calls were being robo-dialed.

On that issue, the evidence would allow a jury to find that Viking is liable and has violated the Act.

Viking admits, at the very least, that was its intent and it expected that Xcel Direct would be using an ATDS to send the text messages. Monda depo 30:1-7 (asked if Xcel Direct was using an ATDS, Monda responded "I would assume that they were.")

The record also would allow a jury to find Viking liable using a variety of other evidence. On July 19, 2011, Dave Moulder, the owner of Viking, wrote to the president of Xcel Direct: "You said these people opted in to receive text messages. What's up?" P's Ex. 1. As Jere Monda acknowledged at his deposition, the only time a marketer has to obtain express consent to call a cell phone is if the marketer is using an ATDS. Monda depo 29:18-22. Asked why Xcel Direct could use an ATDS to send these text messages, if it was against the law to do so, Moulder responded: "They were opting in to receive a text message." Moulder depo 71:20-22.

A second common issue is whether Viking obtained valid consents from consumer to receive text messages from Viking. The issue of consents was discussed by Viking and Xcel Direct before this program was started. At his deposition, Moulder insisted he 'thought' the persons had provided express consent to receive messages, because Mark Lyon, the owner of Xcel Direct, told Moulder that he had consents. But Moulder acknowledged that he did not act to ensure the existence and validity of those purported consents:

4

- Moulder does not recall if he asked Mark Lyon, the owner of Xcel, how he obtained the consents;

- Moulder took no steps to confirm the consents, and instead decided to "trust the guy;"

- Moulder does not know whether the consents purportedly obtained by Xcel Direct expressly permitted Viking to contact them; and

- Moulder did not ask for copies of the consents.

Moulder depo 96:9-20. The common issue of whether Viking obtained valid consents also relates to the issue of whether a robo-dialer was used to send the text messages: Moulder's extensive testimony on this issue of consents would be nonsensical if Viking believed that Xcel Direct was manually sending text messages to consumers instead of using a robo-dialer.

Another common issue, subject to the common proof obtained in the depositions of Moulder and Monda, is Viking's clear knowledge of its liability for sending text messages for marketing purposes without confirming express consents had been obtained. On February 2, 2011, shortly before Viking started its text-message marketing campaign, Jere Monda, Viking's marketing director and sales manager, sent Dave Moulder a link to an article from CBSChicago.com reporting on a lawsuit against a marketing company for sending text messages to cell phones without getting consent, in violation of the Act. The article stated that Wenner Media LLC had been "charged with making unsolicited text message calls to cellular telephones to promote paid subscriptions to their products, including magazines …." Monda depo 19:8-15; P's Exs. 1 and 2.

In the e-mail to which the link was attached, Monda told Moulder: "[t]his shows the risks." Ex. 1; Moulder depo 51:5-20. Moulder identified the risk as "being sued for spam texting." *Id.* Moulder understood that the article was talking about the fact that "[p]eople weren't opting in." *Id.*

When Viking agreed, without having seen any proof of consents, to permit a fly-by-night text messaging service to send out thousands of Viking text messages, it did so with full knowledge of its potential liability under the TCPA for sending those messages, evidenced by both its own business practices (i.e., not calling cell phones using an ATDS) and the CBSChicago.com article.

Finally, the level of recovery to class members under the Act is also a common issue. The Act provides a range from $500 to $1,500. The record will allow a fact-finder to make a single determination on that issue, based on evidence of willfulness and recklessness applicable to this program, which included all of these class members.

### III. ISSUES ARISING UNDER THE TCPA

    A.    *A Text Message is a "Call" under the TCPA.*

Viking has implied that it does not agree that texts are cell phone 'calls' under the Act. This is another common issue for class certification. Courts have concluded that a text message is a "call" as that term is used in the TCPA. *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954 (9th Cir. 2009) ("we find that the FCC's interpretation of the TCPA is reasonable, and therefore afford it deference to hold that a text message is a 'call' within the TCPA"); *Lozano v. Twentieth Century Fox Film Corp.,* 702 F. Supp. 2d 999, 1009 (N.D. Ill. 2010) ("the Court agrees with the FCC's interpretation that § 277 of the TCPA applies to text messages"); *Joffe v. Acacia Mortgage Corp.,* 211 Ariz. 325, 331 (2005) (a "text message may constitute a call subject to the TCPA if the other requirements of the statute are met").

    B.    *Viking Bears the Burden of Establishing that It Had the Prior Express Consent of Silbaugh and the Class Members to Send Them Text Messages.*

The next common question for class certification is who bears the burden of proving consent by a consumer to be robo-dialed—the plaintiff or the defendant. Viking has emphatically claimed it does not have any duty to show such consent. The case law disagrees.

Under the TCPA, the defendant has the burden of proving that it had a consumer's prior express consent to send him a text message. *Moore v. Firstsource Advantage, LLC,* No. 07-CV-770, 2011 U.S. Dist. LEXIS 104517, at *32 (W.D.N.Y., Sep. 15, 2011) ("Defendant bears the burden of proof on the question of 'prior express consent'"). The FCC has noted that to "ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed and prerecorded message calls, [the FCC] conclude[s] that the <u>creditor should be responsible for demonstrating that the consumer provided prior express consent</u>. The creditors are in the best position to have records kept in the usual course of business showing such consent …." (Emphasis added.) *In the Matter of Rules and Reulgations Implementing the Telephone Consumer Protection Act of 1991; Request of ACA International for Clarification and Declaratory Ruling,* FCC 07-232, 23 FCC Rcd 559, 565 (2008); *Sengenberger v. Credit Control Services, Inc.,* No. 09 C 2796, 2010 U.S. Dist. LEXIS 43874, at *7-8 (N.D. Ill, May 5, 2010) (citing *U.S. v. First City Nat. Bank of Houston,* 386 U.S. 361, 366 (1967) for the proposition that "where one claims the benefit of an exception to the prohibition of a statute, that party carries the burden of proof").

Viking is not a novice in the field of maintaining business records relating to communications with customers. Its employees regularly call thousands of customers to verify their purchases. Moulder depo 15:13-25. The "verification" is recorded by Viking. *Id.* In short, Viking knows how to maintain business records confirming that a consumer has agreed to a transaction. In this case, it has not met its burden of showing consent, and has not produced a

7

single opt in for any of the consumers who received Viking text messages that were sent by means of a robo-dialer.

> C. *The Class Members Do Not Have to Prove that They Were Charged for the Text Messages that They Received from Viking.*

The next common issue for class certification is whether a plaintiff, and any class member, must prove they were charged for the robo-call before they can recover the statutory damages provided by Congress under the Act.

A recipient of a robo-call does not have to prove that he was charged for a text message to state a claim under the TCPA. *Lozano,* 702 F. Supp. 2d at 1010 ("the plain language of the TCPA does not require the Plaintiff to allege that he was charged for the relevant call at issue in order to state a claim pursuant to § 227"); *Gutierrez v. Barclays Group,* No. 10cv1012 DMS (BGS), 2011 U.S. Dist. LEXIS 12546, at *16 (S.D. Cal., Feb. 9, 2011) ("Plaintiffs need not show that they were charged for the calls or text messages to their cellular phones to prevail on their TCPA claims").

**IV. CLASS CERTIFICATION**

The Plaintiff moves for certification of a class consisting of all persons sent Viking texts with an ATDS since February 1, 2011.

The discovery conducted in this matter for purposes of class certification shows that the Plaintiff meets all of the Rule 23 requirements for class certification: numerosity, commonality, typicality, adequacy of representation, superiority, and predominance.

> A. *Numerosity.*

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Here, at least 1,000 consumers called Viking in response to the robo-dialed

Viking text messages.. Moulder depo 43:10-14, 95:6-14; P's Ex. 14. The joinder of 1,000 plaintiffs would be impracticable. Therefore, numerosity is satisfied.

    *B.        Commonality.*

Rule 23(a)(2) requires a common question of law or fact. *Bittinger v. Tecumseh Prods. Co.,* 123 F.3d 877, 884 (6th Cir. 1997). There are several common questions of fact and law in this case, as described above, as well as:

- Did Viking use an ATDS to call the class members?

- Did Viking have prior express consent of the class members to send them text messages?

- Did Viking willfully or knowingly violate the TCPA? Viking's familiarity with the TCPA as a telemarketer, when considered in conjunction with its failure to obtain copies of any opt ins, strongly suggests that its conduct was willful. This issue is significant because 47 USCS § 227(c)(5)(C) provides for treble damages for willful or knowing violations of the TCPA.

For Silbaugh to prosecute her claim, these issues must be addressed. And once these issues are resolved with respect to Silbaugh's claim, they are resolved for all of the class members. For example, if Viking does not have <u>any</u> records showing that it obtained consent to call cell phones, it will not be able to establish that <u>any</u> of the class members provided express consent to receive telephone calls from Viking. And, if Viking does have opt ins, it must show that those opt ins were given to Viking, and not to a third party that then sold a list of opt ins to Viking. An opt in given to a third party, and sold to Viking by a list broker, is not valid with respect to Viking. *Hinman v. M and M Rental Center, Inc.,* 545 F. Supp. 2d 802, 806-07 (N.D. Ill. 2008) ("[T]he facts before this Court yield that this Defendant engaged a third party to send more than 3,000 facsimiles to targeted businesses. The manner in which the Defendant identified these recipients will not require individualized inquiry.") Finally, if Viking willfully violated the

TCPA by engaging Xcel Direct to send out text messages without first obtaining valid opt ins, its violation of the TCPA was willful with respect to every class member.

  C. *Typicality.*

Civ. R. 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The Sixth Circuit explained that to "meet the typicality requirement, the plaintiffs must show that their 'injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff.'" [Citations omitted.] *Bacon v. Honda of Am. Mfg., Inc.,* 370 F.3d 565, 572 (6th Cir. 2004). Here, the wrong was Viking's use of ATDS to send Viking text messages to the cell phones of the Plaintiff and the class members. Because Viking used an ATDS to send out all of the text messages, Silbaugh's claims are typical of those of the class members.

  D. *Adequacy of Representation.*

A named plaintiff adequately represents a class if (1) her interests are not antagonistic to those of the class members she seeks to represent; and (2) she vigorously prosecutes the interests of the class through qualified counsel. *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1083 (6th Cir. 1996). Silbaugh has no interests that are antagonistic to those of the class members she seeks to represent. Further, she has vigorously prosecuted this claim by completing class discovery within six weeks and promptly filing a motion to certify the class. Finally, Silbaugh's counsel, Messrs. Perotti and Timmerberg, focus their practice on class-action litigation. Affidavit of Patrick Perotti (attached as Appendix 5).

  E. *Common Questions Predominate.*

This class is properly certified under Rule 23(b)(3), because (1) questions of law or fact common to the class predominate over any questions affecting only individual members, and (2)

a class action is superior to other methods for the fair and efficient adjudication of the controversy. Common questions predominate when there is a significant aspect of the case that can be resolved for all members of the class in a single adjudication. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). Here, Viking set up a single text-message marketing campaign that ran for a one-month period. The marketing campaign was conducted in the same manner with respect to all of the class members.

Plaintiff's position is that Viking used an ATDS to send the text messages and never obtained any opt ins. The testimony and actions of Viking's 30(b)(6) deponents, Dave Moulder and Jere Monda, are consistent with Plaintiff's position. Both Moulder and Monda believed Xcel Direct should have obtained opt ins from the putative class members who received text messages. The opt ins were necessary because Moulder and Monda know that Xcel Direct used an ATDS to send text messages to the class members. And Viking has not produced any opt ins from any putative class members. Because of Viking's uniform conduct towards Silbaugh and all of the class members, common questions predominate over individual issues.

Even if Viking could produce some opt ins from class members, a common question, in the form of how Viking obtained the opt ins, would still predominate over individual issues. This is so because any opt ins in Viking's possession would almost certainly have been generated from a single source. The fact that the opts ins were gathered from a single source would create a common question as to whether the opt ins complied with the requirement of the TCPA that the consent granted by the class members related expressly to Viking.

For example, in *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 949 (9th Cir. 2009), the plaintiff received a text message from Simon & Schuster. In response to the plaintiff's TCPA claim, Simon & Schuster argued that the plaintiff had consented to receive text messages from

Nex-tones or its "affiliates," and that Simon & Schuster had obtained her cell phone number from Nex-tones; therefore, Simon & Schuster had the plaintiff's express consent to send her text messages. *Id.* at 949. The court rejected this argument, noting that Simon & Schuster was not an "affiliate" of Nex-tones, because Nex-tones did not own or control Simon & Schuster, and Nex-tones was not a Simon & Schuster subsidiary. Therefore, the express consent that the plaintiff gave to Nex-tones did not extend to Simon & Schuster. *Id.* at 954. The same class-wide analysis would almost certainly apply to any opt ins in Viking's possession.

  F. *Superiority.*

For class certification to be appropriate under Rule 23(b)(3), in addition to showing that common questions predominate over individual issues, the plaintiff must also show that a class action is the superior method for the fair and efficient adjudication of the controversy. The factors to be considered in determining whether a class action is superior to individual actions are: (1) the interest of class members in controlling the litigation; (2) the extent of any litigation already initiated by class members; (3) the desirability of concentrating the litigation in a single forum; and (4) the management difficulties likely to be encountered if a class is certified. *Rugumbwa v. Betten Motor Sales,* 200 F.R.D. 358, 367-368 (W.D. Mich. 2001). Here, these factors weigh in favor of a finding that a class action is the superior method for resolving these claims.

    (1) <u>The individual class members have no interest in controlling the litigation.</u>

Viking has produced no evidence that any of the putative class members, other than the Plaintiff, have filed a claim arising from its TCPA violations. Therefore, there is no evidence that any of the putative class members has an interest in controlling the litigation.

    (2) <u>No litigation has been commenced by any of the class members.</u>

As noted above, there are no known cases that have been filed against Viking for the TCPA violations that occurred in February and March 2011. The absence of parallel individual actions favors class certification. See *Ingram v. Joe Conrad Chevrolet, Inc.,* 90 F.R.D. 129, 133 (E.D. Ky. 1981); Wright, et al., *Federal Practice and Procedure,* § 1780 at 568-571 (2d ed. 1986).

(3) <u>It is desirable to concentrate this litigation in a single forum.</u>

The Third Circuit recently observed that "[a]lthough individual actions under the TCPA may be easier to bring in small claims court than other types of cases, that does not necessarily undermine the greater efficiency of adjudicating disputes involving 10,000 faxes as a single class action." *Landsman & Funk PC v. Skinder-Struass Associates,* 640 F.3d 72, 95 (3d Cir. 2010). The same analysis is applicable here. With over 1,000 putative class members, it would be extremely inefficient to have these claims individually litigated in small claims court.

The Third Circuit also observed that if Congress had "wanted to preclude aggregation of individual TCPA claims, it could have so provided in the TCPA itself or in CAFA, which specifically lists certain types of statutory claims that could not be brought as class actions…. CAFA lists various other statutes, but not the TCPA." *Landsman,* 640 F.3d at 94-95. As the Third Circuit noted, there is "little reason to believe that individual actions are automatically efficient; plaintiffs can still face protracted litigation when they sue individually." *Id.* at 95. Here, a failure to aggregate the claims would not only be inefficient, but it would be unfair to the class members, because it would deny them the benefit of (1) class counsel's knowledge of the TCPA, and (2) the discovery that class counsel has conducted and will conduct. For example, without the discovery conducted in this case, an individual pursuing a claim in small claims court would not be able to establish that the text message she received was sent by means of an ATDS, nor

13

would she be able to establish that Viking's conduct was willful. In short, the small-claims-court plaintiff would have to rely on Viking to admit its liability. Alternatively, class counsel's efforts would have to be repeated 1,000 times, which would be an enormous waste of judicial resources.

(4) <u>No difficulties will be encountered in the management of the class action.</u>

Because the damages for TCPA violations are set by statute, the damages for each class member will be identical. Also, over 1,000 people called Viking in response to the text message that they received. Therefore, all of those class members can be identified from Viking's records.

## V. CONCLUSION

Viking, a sophisticated telemarketer, willfully violated the TCPA by sending out hundreds of text messages without having obtained prior express consent from any of the consumers to whom the text messages were sent. Viking engaged in this conduct, in spite of the fact that it knew that Wenner Media LLC had been sued for the exact same conduct. This case is ideal for class certification because: Viking engaged in a single course of conduct with respect to all of the putative class members; the measure of damages for each class member will be identical; and, it would be grossly inefficient for these claims to be litigated on an individual basis.

Respectfully submitted,

/s/ James S. Timmerberg
James Timmerberg, (#0067499)
Patrick J. Perotti, Esq. (#0005481)
**DWORKEN & BERNSTEIN CO., L.P.A.**
60 South Park Place
Painesville, Ohio 44077
(440) 352-3391    (440) 352-3469 Fax
Email: *jtimmerberg@dworkenlaw.com*
         *pperotti@dworkenlaw.com*

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants today (November 1, 2011).

                                      /s/ James S. Timmerberg
                                      James Timmerberg, (#0067499)
                                      Patrick J. Perotti, Esq. (#0005481)
                                      **DWORKEN & BERNSTEIN CO., L.P.A.**
                                      One of the Attorneys for Plaintiff